NOT DESIGNATED FOR PUBLICATION

No. 122,173

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of
A.P., A.M., C.M., A.M.-P., E.P., and N.P.,
Minor Children.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Opinion filed May 1, 2020. Affirmed.

*Michael J. Nichols*, of Michael J. Nichols, P.A., of Kansas City, for appellant natural mother.

*Daniel G. Obermeier*, assistant district attorney, and *Mark A. Dupree Sr.*, district attorney, for appellee.

Before GARDNER, P.J., ATCHESON and SCHROEDER, JJ.

PER CURIAM: Mother appeals the termination of her parental rights to her six children. She challenges each of the district court's findings: that she is unfit, that the conduct or condition that made her unfit is unlikely to change in the foreseeable future, and that termination of her parental rights is in the children's best interests. But this case distills to a credibility battle, and the district court found persons other than Mother credible. We thus affirm.

*Factual and Procedural Background*

The children involved in this case and their ages when initially removed from the home were: A.P., a 17-year-old girl; E.P., a 15-year-old boy; N.P., a 13-year-old girl;

1

A.M., a 10-year-old boy; C.M., a 9-year-old boy; and A.M.-P., a 6-year-old boy. (In the event the district court has found it no longer appropriate for it to exercise jurisdiction over A.P., or has ordered her discharged, see K.S.A. 2019 38-2203[c], [d], this opinion is moot as to A.P.) Mother is the mother of all the children. Father is the father of A.M, C.M., and A.M.-P. and the stepfather of A.P., E.P., and N.P. Paternity for A.P., E.P., and N.P. was not established, but only Mother's parental rights are at issue here.

In April 2018, the Department for Children and Families (DCF) received a report alleging that Father had sexually abused A.P. A.P. said she had not told anyone before because she was afraid of Father. Scott Evans, a child protection specialist at DCF, interviewed A.P.'s sister, N.P. When asked if she knew why police and DCF were involved, N.P. stated, "my stepdad touched me and my sister." Evans asked N.P. if she had told her Mother. N.P. said she had done so a couple of days before, but her Mother did not believe her. N.P. said that her Mother works nights, so A.P. takes care of the children. Evans then offered Mother help from social service agencies, but Mother responded, "I'll let you know."

Later that month, the children were placed in temporary protective custody by law enforcement. According to Evans, as the children were being taken, an interpreter heard Mother tell A.P., "see this is what happens when you talk." That same day, Evans interviewed A.M. A.M. said he saw Father touch A.P.'s private parts and sometimes saw Father on top of A.P. A.M. did not tell Mother about this because he thought she would argue with Father again.

A few days later, Evans interviewed Mother. When asked about her plans for housing after the children's release from protective custody, Mother told Evans that the children would stay with her cousin in Gardner, but she planned to continue living with Father.

The district court soon placed the children in temporary custody with DCF. The district court held that the children would likely sustain harm if not immediately removed from the home because Mother had not responded to the sexual abuse allegations and Mother still planned to live with Father.

A few months later, the children were adjudicated as children in need of care. Mother appeared at the hearing in person and through her attorney. While Mother was present, the district court issued a no-contact order between Father and the children.

Reintegration was the case-plan goal. At first, visits were supervised at Kaw Valley Center (KVC.) But before long, the visits moved to unsupervised in the community. Mother completed most of the tasks required in the plan of reintegration. She signed the releases of information, completed a mental health assessment, completed the ACT parenting class, and participated in weekly visits with the children. In December 2018, Mother completed the Darkness to Light's Steward of Children online program. That program is designed to help parents understand when their child has been sexually abused.

There were no concerns with the visits until March 2019 when A.M.-P. unintentionally told his foster parent that Father had been at the visits. E.P. also disclosed to his foster parent that Father had been at visits with Mother in the home.

Ramona MacDougall, a court services officer, learned that Father had been at some visits with the children and confronted Mother about it. Mother at first denied it. But then Mother said Father had come by to bring child support and that she had not seen him any other time. MacDougall stressed to Mother that Father was not allowed to be at the visits.

The State then moved to terminate Mother's parental rights to all six children. At trial, the State called four witnesses, and Mother testified against termination.

*State's Evidence*

The State's first witness was Erin Miller Weiss, an interview specialist at Sunflower House. Weiss forensically interviewed N.P. and A.M. Weiss learned from N.P. of possible ongoing sexual abuse by Father. N.P. told Weiss that Father had been touching her and her sister. N.P. said when she told Mother about Father's abuse, Mother reacted as if N.P. and A.P. were just playing around. In Weiss' interview with A.M., he reported that he saw Father on top of his sister, A.P. A.M. informed Weiss that when he had told Mother about what he saw, she did not believe him, but that Mother said she would talk to Father. A.M. told Weiss he thought this was in 2016. Mother did not object to this or any other testimony as hearsay.

Next the State called MacDougall, the court services officer. She started working the case at the end of July 2018. She testified that a no-contact order was entered between Father and the children on the day the district court adjudicated them as children in need of care. Mother had completed parenting classes in October 2018 and the Darkness to Light program sometime before April 2019.

After Mother completed these programs, MacDougall received a critical incident report about Father attending the visits. This concerned MacDougall because Mother had completed the parenting classes, yet by allowing the alleged sexual abuser to be around the children, Mother failed to protect them. And this violated the no-contact order the judge had issued in Mother's presence.

MacDougall confronted Mother about Father being at the visits with the children. At first, Mother told her that Father was not at the visits. But then Mother said Father had

4

come by to bring child support and that she had not seen him any other time. MacDougall understood that Mother was implying that the children had been in the home at the time Father gave Mother child support. MacDougall reiterated to Mother that Father was not permitted to be at the visits.

Regarding Mother's progress, MacDougall felt like Mother was completing court orders, but she did not believe Mother understood their seriousness or what she needed to do to protect her children from Father or in future relationships. Moving forward, MacDougall had two main safety concerns: (1) Mother inadequately protecting the children from any new relationships; and (2) Mother not believing that the children had been sexually abused. MacDougall recommended termination of parental rights.

A.M.-P.'s foster parent then testified. Before visiting Mother, A.M.-P. was counting who was going to be there because he was bringing presents. A.M.-P. counted Father. When the foster parent asked A.M.-P. about counting Father, A.M.-P. recounted and said, "Not my dad." A.M.-P. then told the foster parent that he did not see his dad. The foster parent remained silent. A.M.-P. then asked her if she believed him, and she replied that she did not. A.M.-P. then told her that he does see his dad at visits, but that Mother had told him not to tell. He asked the foster parent not to tell anyone. She told A.M.-P. she could not do that. The foster parent thought that A.M.-P. felt really bad about telling her. He did not want her to tell anyone, including her husband and KVC. A.M.-P. was "upset by the whole thing."

The State's final witness was Marissa Scheele, the KVC case manager originally assigned to the case. Scheele had worked the case for two months, and then had it reassigned to her in April 2019. Scheele testified that there was quite a bit of discussion between herself, Mother, and DCF about Father's alleged abuse of A.P. and N.P. In the beginning, Mother didn't necessarily believe that the abuse had happened.

The first day Scheele was reassigned the case, she was told the visits had been moved back because of concerns that Father was at the visits. Scheele then asked all the children whether Father had been at the visits with Mother. A.M.-P. was very quiet about it. He mentioned something about presents but would not tell Scheele anything else. Scheele said A.P. and N.P. did not want to talk about it. E.P. admitted to Scheele that Father had come to some visits, but he would not tell her how many.

Scheele found that from the time she was first assigned the case to the termination hearing, the situation had not changed much. If the court did not terminate parental rights, her main concern was Mother's history of lack of appropriate people around her children. Scheele recommended permanency in the fastest way possible that addressed the best interests of the children.

*Mother's Testimony*

Mother testified that she first became aware of the alleged sexual abuse when the police showed up at her house. Mother admitted that before the police came, A.P. and N.P. had told her about the abuse, but she thought they were joking around so she did not believe them. Once the case started, Mother did believe her daughters, and she moved out of the house. Mother participated in the Darkness to Light program and it was helpful to her. Since the case began, she had not let Father around her children.

When asked about the statements A.M.-P. and E.P. had made to their foster parents, Mother stated that Father had never been at the visits. When asked if she recalled being confronted by MacDougall, Mother said, "E.P. told her that [Father] was, from far away, trying to say hi to the kids; and she told him not to be—not to be going over there." After Mother's attorney recounted MacDougall's testimony and again asked Mother if she recalled that conversation, Mother said that MacDougall had misunderstood what she said. Mother had said that Father never gave her money for the kids and had never been

around the kids, not even at a distance. Mother believed she would be able to protect her children from Father and others that may come to the home.

*District Court Decision*

The district court found clear and convincing evidence that Mother allowed Father to attend her unsupervised visits with the children. It found that the reports were credible from two of the children that Father had been at the visits, that the children's testimony was consistent, and that none of the children denied Father was at the visits. The district court held that Mother's allowing Father to have contact with the children, telling the children not to disclose that fact, then denying that contact at trial showed Mother was unfit because:

- reasonable efforts by appropriate agencies had been unable to rehabilitate the family, K.S.A. 2019 Supp. 38-2269(b)(7);
- Mother had not made a sufficient effort to adjust her circumstances to meet the needs of the children, K.S.A. 2019 Supp. 38-2269(b)(8); and
- Mother had failed to carry out a reasonable, court-approved plan aimed at reintegrating the family while the children were out of her physical custody, K.S.A. 2019 Supp. 38-2269(c)(3).

The district court concluded that Mother's unfitness was unlikely to change in the foreseeable future because even after completing classes designed to help parents handle their children's reports of sexual abuse and protect them in the future, Mother still allowed Father around the children and directed them not to tell authorities. The district court said that the Darkness to Light program "hasn't taken" with Mother; that she got from it everything she could, but she still allowed Father around the children until he was placed in custody.

7

The district court concluded that termination was in the best interests of the children because the children needed permanency. The district court found the children needed to be in a home that would protect them and address their trauma. The district court concluded that Mother could not protect the children because even after the authorities' involvement, the children's removal from the home, and Mother's completion of parenting classes, Mother still allowed Father to have contact with the children and continued to deny the children's reports of abuse. The district court said the children's need for protection took a backseat to Mother's protection of Father. The district court did not believe that the children would be safe if left unsupervised with Mother.

The district court held that clear and convincing evidence showed Mother was unfit, that the conduct or condition that made her unfit was unlikely to change in the foreseeable future, and that termination of her parental rights was in the children's best interests. Mother appeals.

*Clear and convincing evidence showed that Mother was unfit and that her unfitness was unlikely to change in the foreseeable future.*

*Basic legal principles*

We begin with an outline of the basic principles governing termination proceedings under the revised Kansas Code for Care of Children, K.S.A. 2019 Supp. 38-2201 et seq. A parent has a constitutionally recognized right to a parental relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008) (citing *Santosky*). The right is a constitutionally protected liberty interest. See *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (substantive liberty interest); *Pierce v. Society of the Sisters*, 268 U.S. 510, 534-35, 45 S. Ct. 571, 69 L. Ed. 1070 (1925) (recognizing "the liberty of parents and guardians to direct the upbringing

8

and education of children under their control"). Accordingly, the State may extinguish the legal bond between a parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 2019 Supp. 38-2269(a); *Santosky*, 455 U.S. at 769-70; *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

After a child has been adjudicated in need of care, a district court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2019 Supp. 38-2269(a). In considering a parent's unfitness, the district court may apply the factors outlined in K.S.A. 2019 Supp. 38-2269(b) and, when the child has been removed from the home, the additional factors in K.S.A. 2019 Supp. 38-2269(c). The district court may also turn to any of the 13 statutory presumptions in K.S.A. 2019 Supp. 38-2271 to prove unfitness. The district court may consider nonstatutory grounds demonstrating parental unfitness. See K.S.A. 2019 Supp. 38-2269(b) (district court "not limited to" listed factors in considering unfitness). That did not happen here. A single factor may be sufficient to establish unfitness. See K.S.A. 2019 Supp. 38-2269(f).

In gauging the likelihood of change in the foreseeable future under K.S.A. 2019 Supp. 38-2269(a), the courts should use "child time" as the measure. As the Kansas Code for Care of Children recognizes, children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult, and that difference in perception typically tilts toward a prompt, permanent disposition. K.S.A. 2019 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008); *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ("'child time'" differs from "'adult time'" in care proceedings "in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's").

When the sufficiency of the evidence supporting a decision to terminate parental rights is challenged, an appellate court will uphold the decision if, after reviewing the record evidence in a light most favorable to the State as the prevailing party, the district court's findings on unfitness and foreseeability of change are supported by clear and convincing evidence. Stated another way, the appellate court must be persuaded that a rational fact-finder could have found it highly probable that the circumstances warrant the termination of parental rights. *In re B.D.-Y.*, 286 Kan. at 705. In evaluating the record, the appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or determine factual questions. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010); *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014).

The district court's best interests determination differs from the measure for unfitness. As directed by K.S.A. 2019 Supp. 38-2269(g)(1), the district court shall give "primary consideration to the physical, mental[,] and emotional health of the child" in making a best interests finding. A district court decides best interests based on a preponderance of the evidence. See *In re R.S.*, 50 Kan. App. 2d at 1115-16. The decision essentially rests in the district court's sound judicial discretion. 50 Kan. App. 2d at 1116. An appellate court reviews those sorts of conclusions for abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

*Analysis*

*Failure of Reasonable Efforts to Rehabilitate the Family*

In finding unfitness, the court may consider the failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family. K.S.A. 2019 Supp. 38-2269(b)(7). We find sufficient evidence to support the district court's holding that reasonable efforts by appropriate agencies had been unable to rehabilitate the family.

Mother completed many of the case-plan tasks. She attended weekly visits with the children, completed a mental health assessment, and completed ACT parenting classes. With the assistance of an interpreter and a KVC laptop, Mother completed the Darkness to Light program in December 2018 at KVC. Housing and verification of income were problems for Mother, but the district court did not rely on those factors in deciding she was unfit.

The district court instead relied on narrow grounds—that Mother had allowed Father to have contact with the children despite a no-contact order, then tried to cover it up. Since August 2018, there had been a no-contact order between Father and the children, and Mother knew about it. She was at the hearing when that order was issued, and it was part of every case plan. At trial, the State introduced credible testimony from Scheele, MacDougall, and the foster parent that Father had been at Mother's unsupervised visits with the children.

The foster parent testified that A.M.-P. said Mother had told him not to tell anyone that Father had been at the visits. The district court found A.M.-P.'s statement to be credible and noted that the children's statements were consistent. A.M.-P.'s statement to the foster parent shows that Mother knew it was inappropriate for Father to be at the visits, but she allowed him to participate anyway, and tried to cover it up.

11

Mother argues that the statements by A.M.-P. to the foster parent were made "in a context that is open to nearly unlimited interpretation" and that "there are countless other plausible explanations" for A.M.-P.'s statement. But in determining whether a rational fact-finder could have found a fact highly probable, we do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705. The district court found A.M.-P.'s report to be "pretty credible"; we cannot reexamine that credibility.

Mother also suggests that we should believe her testimony that since the case began she had never let Father around the children. But we cannot reweigh credibility. And MacDougall's testimony undercut Mother's. MacDougall said that when she confronted Mother about Father being at the visits, Mother gave inconsistent responses. At first Mother told MacDougall that Father had not been present, but then she said that Father had come by to bring her child support. At trial, Mother testified that MacDougall had misunderstood her and that she had said Father never gave her money. On cross-examination, Mother testified that E.P. had seen Father outside of a restaurant they were at for one of their visits. E.P. was just trying to say hello, waving at Father, but Father was far away. The district court found MacDougall's testimony to be credible. We must do the same.

Based on these facts, a reasonable fact-finder could find it highly probable that reasonable efforts by appropriate agencies had been unable to rehabilitate the family.

*Lack of Sufficient Effort to Adjust to Meet the Children's Needs*

In finding unfitness, the court may also consider the lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child. K.S.A. 2019 Supp. 38-2269(b)(8). Sufficient evidence supports the district

court's holding that Mother had not made sufficient effort to adjust her circumstances to meet the needs of the children.

The purpose of the Darkness to Light program was to get Mother to acknowledge her children's reports of past abuse and to show her ability to protect them from future abuse. But even after completing this program, Mother allowed Father to have contact with the children. Mother not only allowed contact but also denied that contact occurred, again disputing statements made by her children. Mother made good progress on her plan tasks yet chose not to make the changes necessary to keep her children safe. A reasonable fact-finder could find it highly probable that Mother had not made enough effort to adjust her circumstances to meet the needs of the children.

*Failure to Carry out a Reasonable Court-Approved Plan*

When a child is not in the physical custody of the parent, in finding unfitness, the court may also consider the failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home. K.S.A. 2019 Supp. 38-2269(c)(3). We find sufficient evidence supporting the district court's holding that Mother had failed to carry out a reasonable, court-approved plan aimed at reintegrating the family while the children were out of her physical custody.

A reasonable reintegration plan was established for Mother—it would help her come to terms with the reports that her children had made and help her to protect the children going forward. Mother completed parenting classes, including classes specifically designed for parents of children who had been sexually abused. The plan seems to have been working until the children revealed that Father had been attending the visits. Mother completed the Darkness to Light program in December 2018. Her unsupervised visits with the children began after that. But despite what she should have learned in the program, and despite her knowledge of the no-contact order, she still

13

allowed Father to attend her unsupervised visits with the children. The district court said that allowing Father to have contact with the children "blew a giant hole" in the plan. We agree. A reasonable fact-finder could find it highly probable that Mother had failed to carry out a reasonable, court-approved plan aimed at reintegrating the family while the children were out of her physical custody.

*Unlikely to Change in the Foreseeable Future*

The district court also found that Mother's unfitness was unlikely to change in the foreseeable future. Clear and convincing evidence supports that finding. At the outset of the case, KVC was concerned that Mother did not believe her children when they told her about Father's sexual abuse of A.P. and N.P. Mother completed the Darkness to Light program, and at trial, Mother testified that she thought the program had helped her, and that she believed her children. But Mother allowed Father to have contact with the children *after* completing the Darkness to Light program and then denied that conduct. The district court said that allowing Father to have contact with the children showed a "continuing and ongoing inability of the mother to understand the inappropriateness of this . . . that she doesn't really understand why that wouldn't be good for the children."

Scheele, the KVC case manager, said that at the beginning of the case, she had discussions with Mother about Father's abuse of A.P. and N.P. Scheele said that Mother did not initially believe her daughters about the abuse. Scheele testified that from the time she had first been assigned the case to the date of the termination hearing, the situation had not changed much.

When the case first began, Mother did not believe her children's reports. After completing a program to help her handle reports of sexual abuse and protect her children in the future, she still allowed the children's alleged abuser to have contact with them, and then denied the conduct afterward. Mother's conduct did not improve over time so as to

14

suggest it was likely to change, if given more time. And as the district court found, Mother was "disingenuous" in her testimony about contact with Father and was "not forthcoming" with the professionals about it. Based on these facts, a reasonable fact-finder could find it highly probable that Mother's unfitness was unlikely to change in the foreseeable future.

*The district court did not abuse its discretion in determining that termination of Mother's parental rights was in the children's best interests.*

The district court held that the children's best interests would be served by obtaining permanency in a home where they could address and overcome the trauma they had suffered and where the children could be protected. The district court concluded that Mother could not provide the necessary protection for the children because she had facilitated Father's contact with the children despite a no-contact order, had told the children to keep quiet about it, and then she denied the conduct afterward. The district court did not believe that the children would be safe if left unsupervised with Mother.

The district court did not abuse its discretion in determining termination of Mother's parental rights was in the children's best interests. Its decision was not based on a factual or legal error, and a reasonable person could agree that living with Mother would not promote the physical, mental, or emotional health of the children because she allowed the children's alleged abuser to have continued contact with them in defiance of a court order, directed the children to keep quiet about it, and then denied the conduct when it was discovered.

Affirmed.

15